

1    Andrus,Andaliwa

2    CDC No.V-90136

3    P.O. BOX 4000, (21-V2-M)

4    Vacaville, California,95696-4000

5

6    Pro Per                    E-filing

7

8                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
9                          CV   08   3948

10   Andrus,Andaliwa                     Case No.---------
              plaintiff,                 Petition For A Writ Of
11                                       Habeas Corpus
        vs.
12                                                    JSW
     D.K.Sisto,Warden
13            Respondent,
                                                     (PR)
14   ------------------------

15

16

17

18

19

20

21

22

23

24

25

26

27

1 | Who to Name as Respondent

2 |      You must name the person in whose actual custody you are. This usually means the Warden or

3 | jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4 | you are imprisoned or by whom you were convicted and sentenced. These are not proper

5 | respondents.

6 |      If you are not presently in custody pursuant to the state judgment against which you seek relief

7 | but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8 | custody you are now and the Attorney General of the state in which the judgment you seek to attack

9 | was entered.

10 | A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11 |     1. What sentence are you challenging in this petition?

12 |         (a)    Name and location of court that imposed sentence (for example; Alameda

13 |               County Superior Court, Oakland):

14 |        LOS ANGELES COUNTY COURT BLD.     L.A.COUNTY

15 |               Court                    Location

16 |         (b)    Case number, if known  BA260824

17 |         (c)    Date and terms of sentence  03/18/2005, 11 years & 6 months

18 |         (d)    Are you now in custody serving this term? (Custody means being in jail, on

19 |               parole or probation, etc.)        Yes _x_   No _____

20 |               Where?

21 |               Name of Institution: _CSP-SOLANO,II

22 |               Address: P.O.BOX 4000,(21-V2-M) Vacaville,Ca.95696

23 |     2. For what crime were you given this sentence? (If your petition challenges a sentence for

24 | more than one crime, list each crime separately using Penal Code numbers if known. If you are

25 | challenging more than one sentence, you should file a different petition for each sentence.)

26 | Premeditated attempted murder(P.C.664/187,Subd.(a)[count 1)

27 | corporal injury to a spouse/cohabitant P.C.273.5 Sudb.(a)

28 | assault with a deadly weapon,P.C.245 Subd,(a)(1)
plus two enhancements for P.C.12022,Subd.(b)(1),P.C.12022.7 subd.(e).

PET. FOR WRIT OF HAB. CORPUS    - 2 -

1    3. Did you have any of the following?

2         Arraignment:                                    Yes __x__    No _____

3         Preliminary Hearing:                            Yes __x__    No _____

4         Motion to Suppress:                             Yes __x__    No _____

5    4. How did you plead?

6         Guilty _____    Not Guilty _x__    Nolo Contendere _____

7         Any other plea (specify) _____

8    5. If you went to trial, what kind of trial did you have?

9         Jury _X__    Judge alone_____    Judge alone on a transcript _____

10   6. Did you testify at your trial?                    Yes __x__    No _____

11   7. Did you have an attorney at the following proceedings:

12        (a)    Arraignment                              Yes _x__     No _____

13        (b)    Preliminary hearing                      Yes _x__     No _____

14        (c)    Time of plea                             Yes _x__     No _____

15        (d)    Trial                                    Yes _x__     No _____

16        (e)    Sentencing                               Yes _x__     No _____

17        (f)    Appeal                                   Yes _x__     No _____

18        (g)    Other post-conviction proceeding         Yes _x__     No _____

19   8. Did you appeal your conviction?                   Yes _x__     No _____

20        (a)    If you did, to what court(s) did you appeal?

21               Court of Appeal                          Yes _x__     No _____

22               Year: _____    Result: Denied Conviction Affirmed

23               Supreme Court of California              Yes _x__     No _____

24               Year: 06/2008    Result: Denied

25               Any other court                          Yes _____    No _x__

26               Year: _____    Result: _____

27

28        (b)    If you appealed, were the grounds the same as those that you are raising in this

1                 petition?                         Yes _____     No__x__

2         (c)    Was there an opinion?          Yes _____     No__x__

3         (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                                         Yes _____     No__x__

5                 If you did, give the name of the court and the result:

6           _____

7           _____

8 9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9 this conviction in any court, state or federal?            Yes _____    No_X___

10       [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11 challenged the same conviction you are challenging now and if that petition was denied or dismissed

12 with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13 for an order authorizing the district court to consider this petition. You may not file a second or

14 subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15 U.S.C. §§ 2244(b).]

16         (a)    If you sought relief in any proceeding other than an appeal, answer the following

17                 questions for each proceeding. Attach extra paper if you need more space.

18             I.       Name of Court: _____

19                      Type of Proceeding: _____

20                      Grounds raised (Be brief but specific):

21                          a._____

22                          b._____

23                          c._____

24                          d._____

25                      Result: _____ Date of Result:_____

26             II.      Name of Court: _____

27                      Type of Proceeding: _____

28                      Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS     - 4 -

1         List, by name and citation only, any cases that you think are close factually to yours so that they

2 are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3 of these cases:

4 _____

5 _____

6 _____

7 Do you have an attorney for this petition?                              Yes_____     No_✓__

8 If you do, give the name and address of your attorney:

9 _____

10         WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11 this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13 Executed on $8-8-08$ _____          _____

14                Date                               Signature of Petitioner

15

16

17

18

19

20 (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS       - 7 -

**TOPICAL INDEX**

Page

Table of Authorities ........................................... iv

Issues Presented .............................................. 2

Reasons for Granting Review ................................... 2

Statement of the Case ......................................... 3

Statement of Facts ............................................ 4

Argument ..................................................... 4

   I.  The Prosecutor's Personal Attacks on Defense Counsel During
      Closing Arguments Violated Appellant's Due Process Right to
      a Fair Jury Trial Which the Federal and State Constitutions
      Guarantee ............................................... 4

      A. Introduction ......................................... 4

      B. The Prosecutor's Initial Closing Argument ............... 5

      C. Prosecutor's Rebuttal Closing Argument ................. 6

      D. Both federal and California law condemn a prosecutor's
         attacks on defense counsel. ............................ 10

      E. Prejudice ........................................... 12

      F. Conclusion ......................................... 18

   II.  The Five-Year Section 12022.7, Subdivision (d), Enhancement
      Should Be Stricken from Appellant's Attempted Voluntary
      Manslaughter Conviction Because That Offense Is Implicitly
      Included in the Subdivision (g) Exception for Manslaughter
      Convictions ............................................. 19

i

## TOPICAL INDEX
## (continued)

Page

III. Imposition of the Upper Term on Both the Conviction and its
Great Bodily Injury Enhancement Based on Aggravating Facts
Determined by a Judge by a Preponderance of Evidence
Violated Appellant's Fifth, Sixth, and Fourteenth Amendment
Rights to Jury Trial and Due Process Because These
Aggravators Were Never Alleged, Admitted, Decided by the
Jury, Defined by Instructions, or Proved Beyond a Reasonable
Doubt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

A. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

B. Federal Constitutional Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

C. Application of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

D. The federal constitutional right to trial by jury
guaranteed by the Sixth and Fourteenth Amendments
prohibited the trial judge from increasing the terms on
his sentence and enhancement above their statutory
maximums, even if based on prior convictions. . . . . . . . . . . . . 26

E. Although this court has decided this issue against
appellant since *Cunningham*, it is raised here to preserve
it pending future action by the United States Supreme
Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

IV. The Trial Court Abused its Discretion in Adding Three and a
Half Years to Appellant's Sentence by Imposing the Upper
Term on His Attempted Voluntary Manslaughter Conviction
and its Domestic Violence Great Bodily Injury Enhancement
Based on Appellant's Prior Convictions . . . . . . . . . . . . . . . . . . . . 29

**TOPICAL INDEX**
**(continued)**

Page

V. Defense Counsel's Failure to Object to the Trial Court's
   Sentencing Decision to Impose the Upper Terms Deprived
   Appellant of His Sixth Amendment Right to Effective
   Assistance of Counsel .................................... 33

   A. Introduction .......................................... 33

   B. Factual Background ................................. 34

   C. Legal Background ................................... 34

   D. Application of Law .................................. 35

   E. Conclusion ........................................ 37

Conclusion ................................................. 37

Opinion ........................................... Appendix A

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Almendarez-Torres v. United States*
(1998) 523 U.S. 224
[118 S.Ct. 1219, 140 L.Ed.2d 350] ...................... 26-29

*Apprendi v. New Jersey*
(2000) 530 U.S. 466
[120 S.Ct. 2348, 147 L.Ed.2d 435] ............... 24-25, 27-29

*Auto Equity Sales, Inc. v. Superior Court*
(1962) 57 Cal.2d 450 ................................... 29

*Blakely v. Washington*
(2004) 542 U.S. 296
[124 S.Ct. 2531, 159 L.Ed.2d 403] ......... 24-25, 27-29, 33-34

*Bruton v. United States*
(1968) 391 U.S. 123
[88 S.Ct. 1620, 20 L.Ed.2d 476] ........................... 14

*Cargle v. Mullin*
(10th Cir. 2003) 317 F.3d 1196 ........................... 13

*Carter v. Illinois*
(1946) 329 U.S. 173
[67 S.Ct. 216, 91 L.Ed. 172] .............................. 34

*Chapman v. California*
(1967) 386 U.S. 18
[87 S.Ct. 824, 17 L.Ed.2d 705] ........................... 17

*Cunningham v. California*
(2007) 549 U.S. 270
[127 S.Ct. 856, 166 L.Ed.2d 856] ............. 24-26, 28-29, 33

iv

## TABLE OF AUTHORITIES
### (continued)

Page

*Darden v. Wainwright*
(1986) 477 U.S. 168
[106 S.Ct. 2464, 2471, 91 L.Ed.2d 144] . . . . . . . . . . . . . . . . . . . . . . 5

*Donnelly v. DeChristoforo*
(1974) 416 U.S. 637
[94 S.Ct. 1868, 40 L.Ed.2d 431] . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Gideon v. Wainwright*
(1963) 372 U.S. 335
[83 S.Ct. 792,  9 L.Ed.2d 799] . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Griffith v. Kentucky*
(1987) 479 U.S. 314
[107 S.Ct. 708, 93 L.Ed.2d 649] . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Perez*
(1966) 65 Cal.2d 224 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Jackson v. Denno*
(1964) 378 U.S. 368
[84 S.Ct. 1774, 12 L.Ed.2d 908] . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Jackson v. Virginia*
(1979) 443 U.S. 307
[99 S.Ct. 2781, 61 L.Ed.2d 560] . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Krulewitch v. United States*
(1948) 336 U.S. 440
[69 S.Ct. 716, 93 L.Ed. 790] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*People v. Ayala*
(2000) 23 Cal.4th 225 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*People v. Black*
(2005) 35 Cal.4th 1238 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## TABLE OF AUTHORITIES
### (continued)

Page

*People v. Black*
(2007) 41 Cal.4th 799 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28-29

*People v. Bolton*
(1979) 23 Cal.3d 208 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*People v. Cardenas*
(1982) 31 Cal.3d 897 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*People v. Castro*
(1985) 38 Cal.3d 301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*People v. Cotton*
(1991) 230 Cal.App.3d 1072 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*People v. Cropper*
(1979) 89 Cal.App.3d 716 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 36

*People v. Epps*
(1981) 122 Cal.App.3d 691 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*People v. Fabert*
(1982) 127 Cal.App.3d 604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*People v. Farnam*
(2002) 28 Cal.4th 107 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*People v. Flood*
(1998) 18 Cal.4th 470 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*People v. Frye*
(1998) 18 Cal.4th 894 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*People v. Gibson*
(1994) 27 Cal.App.4th 1466 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## TABLE OF AUTHORITIES
### (continued)

Page

*People v. Green*
(1980) 27 Cal.3d 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*People v. Haskett*
(1982) 30 Cal.3d 841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*People v. Hill*
(1998) 17 Cal.4th 800 . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10, 12, 14

*People v. Jackson*
(1986) 187 Cal.App.3d 499 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*People v. Jones*
(1991) 53 Cal.3d 1115 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*People v. Jordan*
(1986) 42 Cal.3d 308 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*People v. Lewis*
(1993) 21 Cal.App.4th 243 . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-21

*People v. Mendoza Tello*
(1997) 15 Cal.4th 264 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*People v. Newman*
(1999) 21 Cal.4th 413 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*People v. Ochoa*
(1998) 19 Cal.4th 353 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*People v. Perez*
(1962) 58 Cal.2d 229 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*People v. Piceno*
(1987) 195 Cal.App.3d 1353 . . . . . . . . . . . . . . . . . . . . . . . . . . . 31-33

## TABLE OF AUTHORITIES
### (continued)

Page

*People v. Pope*
(1979) 23 Cal.3d 412 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*People v. Prieto*
(2003) 30 Cal.4th 226 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*People v. Rucker*
(1980) 26 Cal.3d 368 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*People v. Sandoval*
(1992) 4 Cal.4th 155 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

*People v. Scott*
(1994) 9 Cal.4th 331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*People v. Stratton*
(1988) 205 Cal.App.3d 87 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*People v. Superior Court (Alvarez)*
(1997) 14 Cal.4th 968 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*People v. Superior Court (Ghilotti)*
(2002) 27 Cal.4th 888 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*People v. Thompson*
(1988) 45 Cal.3d 86 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-11

*People v. Thompson,*
(1995) 36 Cal.App.4th 843 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*People v. Turner*
(1983) 145 Cal.App.3d 658 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*People v. Wash*
(1993) 6 Cal.4th 215 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## TABLE OF AUTHORITIES
### (continued)

**Page**

### STATUTES

Pen. Code

    § 187 ................................................... 3
    § 192 ................................................. 3-4
    § 193 ................................................. 4
    § 237.5 ............................................... 3
    § 245 ................................................. 3
    § 664 ........................................... 3-4, 19, 21
    § 1170 ............................................... 24
    § 12022 ............................................. 3-4
    § 12022.7 ...................................... 2-4, 19-20, 22

### RULES

Cal. Rules of Court

    rule 4.420 ........................................... 24
    rule 4.421 ........................................ 24, 30-31
    rule 8.500 ......................................... 1, 37
    rule 8.504 ........................................... 1

### CONSTITUTIONAL PROVISIONS

Cal. Const., art. I, § 7 ..................................... 5, 17
Cal. Const., art. I, § 15 .................................... 5, 17
U.S. Const., 5th Amend. .............................. 2, 5, 17, 23
U.S. Const., 6th Amend. ............... 2, 5, 17, 23-26, 33-34, 36-37
U.S. Const., 14th Amend. .................... 2, 5, 17, 23-24, 26, 34

### OTHER AUTHORITY

*5 Witkin & Epstein, Cal. Criminal Law*
    (2d ed. 1988) Trial, § 2914, p. 3570 ........................ 12

## IN THE SUPREME COURT

## OF THE STATE OF CALIFORNIA

**THE PEOPLE,**

    Plaintiff and Respondent,

      v.

**ANDALIWA ANDRUS,**

    Defendant and Appellant.

**B185016**
BA260824

## PETITION FOR REVIEW

To the Honorable Chief Justice And Associate
Justices of The California Supreme Court:

Pursuant to California Rules of Court, rules 8.500 and 8.504,[1/]
defendant and appellant Andaliwa Andrus ("appellant") petitions for review
of an unpublished opinion[2/] issued on March 19, 2008, by Division Four of
the Second Appellate District Court of Appeal, affirming the judgment.

---

[1/]All future references to rules are to the California Rules of Court.

[2/]This opinion is attached as Appendix A and will subsequently be
referred to as "Opinion."

## Issues Presented

(1)   Did the prosecutor's personal attacks on defense counsel during closing arguments violate appellant's due process right to a fair jury trial which the federal and state Constitutions guarantee?

(2)   Should the five-year Penal Code section 12022.7, subdivision (d), enhancement be stricken from appellant's attempted voluntary manslaughter conviction because that offense is implicitly included in the subdivision (g) exception for manslaughter convictions?

(3)   Did imposition of the upper term on both the conviction and its great bodily injury enhancement based on aggravating facts determined by a judge by a preponderance of evidence violate appellant's Fifth, Sixth, and Fourteenth Amendment rights to jury trial and due process because the aggravators were never alleged, admitted, decided by the jury, defined by instructions, or proved beyond a reasonable doubt?

(4)   Did the trial court abuse its discretion in adding three and a half years to appellant's sentence by imposing the upper term on his attempted voluntary manslaughter conviction and its domestic violence great bodily injury enhancement based on appellant's prior convictions?

(5)   Did defense counsel's failure to object to the trial court's sentencing decision to impose the upper terms deprived appellant of his Sixth Amendment right to effective assistance of counsel?

## Reasons for Granting Review

Reasons why review should be granted on each of the above issues are

included in the separate discussions that follow. In general, review should be

granted to settle these issues because they constitute important questions of

law. (Rule 8.500(b)(1).)

2

## Statement of the Case

Appellant was charged with committing willful, deliberate, and premeditated attempted murder (§§ 664/187, subd. (a) [count 1]), corporal injury to a spouse/cohabitant/child's parent (§ 237.5, subd. (a) [count 2]), assault with a deadly weapon (knife) by means of force likely to produce great bodily injury (§ 245, subd. (a)(1) [count 3]), plus two enhancements for personal knife use (§ 12022, subd. (b)(1)) and personal infliction of great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)). The crimes were alleged to have occurred on February 17, 2004 against Celia Escobar ("Celia," the mother of his son, Eddason). (Clerk's Transcript 55-57.)[3]

On March 18, 2005, the jury returned a guilty verdict on attempted voluntary manslaughter (§§ 664/192, subd. (a)), and also found the personal knife use and great bodily injury enhancements to be true. The jury returned not guilty verdicts on all other counts. (CT 201-202, 204, 206-208.)

On June 10, 2005, the trial court sentenced appellant to 11 years and 6 months, consisting of one half of the upper term of 11 years for the

---

[3]The record on appeal consists of six volumes of the reporter's transcript (cited as "1 RT" et seq.), one volume of a supplemental reporter's transcript of the motion for new trial hearing (cited as "SRT"), 1 volume of the clerk's transcript (cited as "CT" et seq.), and one supplemental clerk's transcript consisting of the defense motion for new trial (cited as "SCT".)

attempted voluntary manslaughter (§§ 664/192, subd. (a), & 193 [5 years and 6 months]), plus an additional 5-year upper-term section 12022.7, subdivision (e) enhancement and a 1-year section 12022, subdivision (b)(1) enhancement. (CT 228-230.)

In an unpublished decision filed March 19, 2008, the Court of Appeal affirmed the judgment. (Opinion ("Opn.") 1.)

## Statement of Facts

For purposes of this petition for review only, appellant adopts the facts as stated in the Statement of Facts section of the Opinion. (Opn. 3-6.) Additional facts relevant to the issues presented here will be included in the arguments which follow.

## Argument

### I

**The Prosecutor's Personal Attacks on Defense Counsel During Closing Arguments Violated Appellant's Due Process Right to a Fair Jury Trial Which the Federal and State Constitutions Guarantee**

### A. Introduction

This court has recently recognized that a prosecutor's statements can violate federal constitutional due process guarantees: "Improper remarks by a prosecutor can 'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'" (*People v. Farnam* (2002) 28 Cal.4th

4

107, 167, quoting *Darden v. Wainwright* (1986) 477 U.S. 168, 181 [106 S.Ct. 2464, 2471, 91 L.Ed.2d 144], citing *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 642 [94 S.Ct. 1868, 40 L.Ed.2d 431] & *People v. Hill* (1998) 17 Cal.4th 800, 819.) The prosecutor's misconduct during closing argument in this case violated appellant's due process right to a fair jury trial, as guaranteed by the United States and California Constitutions. (U.S. Const., 5th, 6th, & 14th Amends.; Cal. Const., art. I, §§ 7, 15.)

## B. The Prosecutor's Initial Closing Argument

At the end of this argument, the prosecutor implored jurors to hold appellant responsible for his actions "to the fullest extent of the law." (6 RT 2446:7-8.) But the prosecutor was not content to seek retribution for what had occurred on the day of the attack. He also referred to what occurred in the courtroom:

> Anything less [than the fullest extent of the law] based upon this evidence is giving in to this defendant's humiliation, bullying, selfish treatment of Celia . . . because basically that is all this is, a selfish man who was trying to impose his will on somebody. And it is reflected in how he tried to kill her on that day **and further the treatment of her in this courtroom, further, humiliation and degradation by a bullying, self-centered, attempted murderer.**

(6 RT 2446:9-18, emphasis added.)

5

## C. Prosecutor's Rebuttal Closing Argument

The prosecutor began by stating that defense counsel had done everything possible to personalize the case, even vouching for appellant. He reminded the jury that evidence that Eddason had been molested was not received for its truth, but only its effect on appellant. (6 RT 2504.) When the prosecutor suggested that he would have been "more than happy to litigate that issue, but the court ruled that it was not proper . . . to get into that. . . . ," the court sustained defense counsel's objection. In spite of that ruling, the prosecutor immediately repeated, "Just so you know we would have been more [than] happy to get into that." (6 RT 2504:17-26.) The court then asked him to move on. (6 RT 2505.)

The prosecutor then asserted that the reason the videotape of Detective Soriano's hospital interview of Celia had not been played was because of the court's exclusionary ruling: "And if the court would have allowed it, we would have played it."[4] (6 RT 2505:2-4.) The record includes no discussion of the admissibility of such a videotape, or the court making any ruling about it.

---

[4] Detective Soriano had testified that his interview of Celia was videotaped. (5 RT 1879-1880.) During defense counsel's argument, he had stated that when the prosecution said there was a videotape of Celia's hospital interview, they knew there wasn't one, and asserted they had lied. (6 RT 2492:22; see also 6 RT 2469-2470.)

6

The prosecutor then noted that the defense had suggested they were going to prove that Eddason had been molested, asked whether the defense had proved that, and asserted that "defense counsel's whole argument was laced with things that were not true which he knew that he could never prove." (6 RT 2505:13-15.) Defense counsel's prosecutorial misconduct objection was overruled.

The prosecutor then returned to his theme that defense counsel had injected himself into the case "which he is not supposed to do. But since he did it, let's run with it." (6 RT 2505:26-27.)

During defense counsel's argument, he had asked the jury whether they found out that Celia was an absolutely wretched person when she took the stand. (6 RT 2457:3-5.) He explicitly stated that he was not saying that she went over to appellant's house and consented to have her throat slashed, but she did go there expecting something to happen. (6 RT 2475-2476.) He also said that he would never lift a finger to help her, suggesting that she destroyed Eddason's dignity and his future. (6 RT 2494-2495.)

In responding to these arguments, the prosecutor first charged that defense counsel was continually trying to bring up Eddason's molestation because he didn't want to deal with the facts of the case:

> But what he wants to tell you and he says it very clearly is that Celia . . . deserved to get her throat cut. And he just said it. She

7

> deserved it. . . . What else did he say? He just sat up here and told you be careful what you wish for, you might get it.
>
> This is the kind of Neanderthal thinking that gets women abused and victims of domestic violence.

(6 RT 2508-2509.)

The prosecutor's personal attack continued. "This is the guy that doesn't get it. He is so lost, he can't see the forest through the trees." (6 RT 2509:8-9.)

During his closing argument, defense counsel had asserted that from the beginning of the case he had made a commitment to tell the jury the truth which "ha[d] nothing to do with the fact that I like to hear myself talk." (6 RT 2453-2454.) The prosecutor twisted these words: "And he is going to sit up here and tell you that he doesn't like to hear his own voice. That is all he wants to do is hear his own voice. He just loves to hear himself talk and pat himself [on] the back and not deal with the facts in this case." (6 RT 2509:8-14.)

Defense counsel objected, stating "[t]hat is prosecutorial misconduct to attack an attorney." The court overruled this objection and admonished defense counsel to make no speaking objections. (6 RT 2509:15-21.)

The prosecutor continued his attack, repeating that defense counsel had said that he didn't like to hear himself talk and was "so professional." The

8

court interrupted to tell him to address the facts of the case. (6 RT 2509:22-27.)

The prosecutor then suggested that what the defense really wanted was an attempted voluntary manslaughter finding that appellant acted under heat of passion "which is a bold-face lie." (6 RT 2510:28.) When the prosecutor again referred to defense counsel's voice, he objected: "Attacking counsel is prosecutorial misconduct." The court again repeated its admonishment against speaking objections and told the prosecutor to address the facts and lower his voice. (6 RT 2512:21-28.)

The prosecutor concluded by asking the jury to hold appellant accountable for everything he did, and vouched for the truthfulness of Celia:

> Anything less would be a miscarriage of justice and a mockery of this woman who stood here with courage, who stood up to some horrific counseling -- questioning and humiliation by the defense, but told you the truth.

(6 RT 2516:2-6.)

Defense counsel again objected on prosecutorial misconduct grounds. The court admonished the prosecutor to address the facts and told jurors to disregard the prosecutor's last statement (which vouched for Celia). (6 RT 2516.) As soon as the court told the prosecutor to go on, he repeated that Celia "[t]old you the truth[,]" in spite of the court's admonishment that immediately preceded it.

9

After the jury was dismissed, defense counsel made a record that he had objected to prosecutorial misconduct. When the prosecutor stated there was none, defense counsel made this record: "Referring to opposing counsel as a Neanderthal and abused a witness in this case is without question prosecutorial misconduct." (6 RT 2519:13-15.) The prosecutor did not challenge this representation. The court stated that the transcript would speak for itself. (6 RT 2519:19-23.)

## D. Both federal and California law condemn a prosecutor's attacks on defense counsel.

This court has repeatedly stated that "[a] prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel." (*People v. Hill* (1998) 17 Cal.4th 800, 820 (*Hill*) at p. 832, citing *People v. Wash* (1993) 6 Cal.4th 215, 265; *People v. Thompson* (1988) 45 Cal.3d 86, 112.)

The United States Supreme Court is in accord and "has repeatedly noted that it is improper for counsel to make personal attacks on an opposing advocate . . . ." (*United States v. Carter* (6th Cir. 2001) 236 F.3d 777, 785.) As noted in *United States v. Young* (1985) 470 U.S. 1, 10 [105 S.Ct. 1038, 84 L.Ed.2d 1], "'[a] personal attack by the prosecutor on defense counsel is improper . . . .'" (Quoting ABA Standards for Criminal Justice 4-7.8 (2d ed. 1980).) Prosecutors "must not be permitted to make unfounded and

10

inflammatory attacks on the opposing advocate." (*United States v. Young, supra*, 470 U.S. at p. 9.)

The prosecutor's attacks on defense counsel exceeded these bounds. They began during the conclusion of his initial argument when he suggested that appellant was a selfish man as reflected by the treatment of Celia in the courtroom that further humiliated and degraded her. (6 RT 2446.) Defense counsel later informed the jury that the prosecutor was talking about him. (6 RT 2452.)

During his rebuttal, the prosecutor had an opportunity to correct defense counsel's suggestion that he had accused defense counsel of humiliating and degrading Celia. He did not do so. Instead, he confirmed it by even stronger suggestions that defense counsel had argued that Celia deserved to have her throat cut. (6 RT 2508.)

The prosecutor asserted that what defense counsel wanted to tell the jury was that Celia got what she deserved. Defense counsel exhibited an attitude toward women that was the type of Neanderthal thinking that causes domestic violence. Defense counsel just didn't get it. (6 RT 2508-2509.)

This court has "held it improper for the prosecutor . . . to portray defense counsel as the villain in the case." (*People v. Sandoval* (1992) 4 Cal.4th 155, 183; *People v. Thompson* (1988) 45 Cal.3d 86, 112.) That occurred here.

11

Federal courts have noted that attacks on defense counsel can violate federal constitutional rights. The United States Supreme Court has observed that defense lawyers play a key role in ensuring that every defendant receives a fair trial - they are "necessities, not luxuries." (*Gideon v. Wainwright* (1963) 372 U.S. 335, 344 [83 S.Ct. 792, 9 L.Ed.2d 799].)

California courts have also noted that such misconduct can violate fundamental constitutional rights. In *People v. Turner*[5] (1983) 145 Cal.App.3d 658, 672, the prosecutor also attacked defense counsel as "an additional villain who was attacking the victim." (*Id.* at p. 674.) These suggestions "cast[] aspersions on both [the defendant's] constitutional right to defend himself and his right to be represented by counsel." (*Ibid.*)

## E. Prejudice

This court has recently noted that "[a]n attack on the defendant's attorney can be seriously prejudicial as an attack on the defendant himself . . . ." (*Hill,* at p. 832, quoting 5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Trial, § 2914, p. 3570.)

In *People v. Bolton* (1979) 23 Cal.3d 208, 213, this court recognized that prosecutorial misconduct "can be dynamite to the jury because of the special regard the jury has for the prosecutor . . . ." Federal courts have also

---

[5]*Turner* was overruled on other grounds in *People v. Newman* (1999) 21 Cal.4th 413, 423, fn. 6.

12

noted that "the prosecuting attorney carries a special aura of legitimacy about him." (*Cargle v. Mullin* (10th Cir. 2003) 317 F.3d 1196, 1218.)

In the instant case, the prosecutor asserted that appellant was a selfish bully who paid defense counsel to further humiliate and degrade Celia in the courtroom. (6 RT 2446.) According to the prosecutor, defense counsel's entire argument was laced with falsehoods that defense counsel knew he could never prove. (6 RT 2505.) This court has condemned such arguments:

> A defendant's conviction should be based on the evidence adduced at trial, and not on the purported improprieties of his counsel. When a prosecutor denigrates defense counsel, it directs the jury's attention away from the evidence.

(*People v. Frye* (1998) 18 Cal.4th 894, 978, citing *People v. Sandoval* (1992) 4 Cal.4th 155, 183-184.) The prosecutor's attacks distracted the jury and prejudiced the defense case.

While the prosecutor began his attack on defense counsel during his initial closing argument, he saved his venomous "Neanderthal" attack for rebuttal. This court has described rebuttal as an "especially critical period" (*People v. Perez*[6] (1962) 58 Cal.2d 229, 245) -- the final appeal to the jury -- after which defense counsel had no opportunity to respond.

---

[6]*Perez* was overruled on other grounds in *People v. Green* (1980) 27 Cal.3d 1, 27.)

13

As noted in *Hill*, "[i]t takes no citation to authority . . . to conclude such juvenile courtroom behavior by a public prosecutor demeans the office, distracts the jury, prejudices the defense, and demands censure." (*Hill, supra,* 17 Cal.4th at p. 834.) Suggesting that defense counsel's arguments arose from the kind of Neanderthal thinking that motivates the violence of men against their domestic partners was also juvenile, distracting, and prejudicial to the defense.

The United States Supreme Court has noted that "[t]he naive assumption that prejudicial effects can be overcome by instructions to the jury, all practicing lawyers know to be unmitigated fiction." (*Jackson v. Denno* (1964) 378 U.S. 368, 388, fn. 15 [84 S.Ct. 1774, 12 L.Ed.2d 908], quoting *Krulewitch v. United States* (1948) 336 U.S. 440, 453 [69 S.Ct. 716, 93 L.Ed. 790], internal quotations & citations omitted; see also *Bruton v. United States* (1968) 391 U.S. 123, 135 [88 S.Ct. 1620, 20 L.Ed.2d 476].)

No admonishment could have removed the prejudicial stain from the defense case created by the prosecutor's insult that defense counsel had exhibited the type of Neanderthal thinking that creates domestic violence against women: "If you throw a skunk into the jury box, you can't instruct the jury not to smell it." (*United States v. Garza* (5th Cir. 1979) 608 F.2d 659, 666.)

14

The preliminary test in determining the effect of a prosecutor's comments is whether there is a reasonable likelihood that the jury construed any of the questionable remarks in an objectionable fashion. (*People v. Ayala* (2000) 23 Cal.4th 225, 284; *People v. Ochoa* (1998) 19 Cal.4th 353, 427.) Under these circumstances, there is more than a reasonable likelihood that the jury would have interpreted the prosecutor's attacks in the way he expressed them.

Traditional indicators of prejudice are also evident in the instant case. Although the case evidence was presented in only five days (3/9/05-3/11/05; 3/14/05-3/15/05; CT 110-118), deliberations spanned nearly two full days. (6 RT 2703-2746 [instructions]; 6 RT 2754; CT 124.) On both days, the jury sent out notes requesting further instruction on the law.

Courts have found that deliberations of comparable length indicate that a case is close and that an error requires reversal. (See, e.g., *People v. Cardenas* (1982) 31 Cal.3d 897, 907 [12 hours]; *People v. Rucker* (1980) 26 Cal.3d 368, 391 [9 hours]; *People v. Woodard*[1] (1979) 23 Cal.3d 329, 341 [6 hours]; *People v. Fabert* (1982) 127 Cal.App.3d 604, 610 [6 hours].)

California case law has also noted that compromise verdicts indicate prejudice. (See, e.g., *People v. Thompson,* (1995) 36 Cal.App.4th 843, 849,

---

[1]*Woodard* was superseded by statute on another ground as recognized by *People v. Castro* (1985) 38 Cal.3d 301, 307-310.

853; *People v. Epps* (1981) 122 Cal.App.3d 691, 698 [jury's "selective belief in the evidence"]; *People v. Washington* (1958) 163 Cal.App.2d 833, 845 [acquittal on second count].)

In the instant case, the defense had argued for acquittal. Instead, the jury delivered a voluntary manslaughter verdict. During his initial closing argument, the prosecutor had asserted that the whole case boiled down to whether appellant acted in heat of passion. (6 RT 2431.) Defense counsel disagreed, and replied that to convict appellant of anything for defending his child would be immoral to him. (6 RT 2468.)

By its not guilty verdict on the attempted murder charge (CT 200), jurors rejected the prosecution's primary charge, a result that the prosecutor had characterized as "they win. We lose. . . ." (6 RT 2431:5-6.) But, they also rejected defense counsel's arguments for a complete acquittal. (6 RT 2468.) Their attempted voluntary manslaughter verdict was a compromise between those extremes that demonstrated juror division and uncertainty concerning the prosecution's case and consequent prejudice from the prosecutor's attempts to bolster it with his attacks.

Because of the length of deliberations, the requests for further instructions concerning the law, and the compromise verdict ultimately delivered, it is reasonable to conclude that at least some members of the jury

16

found this case troubling. Consequently, the prosecutor's personal attacks on defense counsel should not be considered harmless.

Because this error violated appellant's due process right to a fair trial, as guaranteed by the United States and California Constitutions (U.S. Const., 5th, 6th, & 14th Amends.; Cal. Const., art. I, §§ 7, 15), the *Chapman* standard applies. (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705].) Under *Chapman*, the burden shifts to the state to prove this error was harmless beyond a reasonable doubt. The United States Supreme Court has described the reasonable doubt standard as requiring a showing of "near certitude." (*Victor v. Nebraska* (1994) 511 U.S. 1, 12 [114 S.Ct.1239, 127 L.Ed.2d 583]; *Jackson v. Virginia* (1979) 443 U.S. 307, 315 [99 S.Ct. 2781, 61 L.Ed.2d 560].) The state cannot meet this heavy burden.

Should this court find this error not of constitutional magnitude, it nevertheless "involve[d] the use of deceptive or reprehensible methods to attempt to persuade . . . the jury" which constitutes misconduct under state law. (*People v. Prieto* (2003) 30 Cal.4th 226, 260.) For state law errors, the *Watson* standard applies. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

This standard also requires reversal because it is reasonably probable a more favorable result would have occurred in the absence of the prosecutor's personal attacks. (*People v. Haskett* (1982) 30 Cal.3d 841, 866.) This court has recently clarified the *Watson* standard, noting that "probability" for

17

purposes of determining whether it is reasonably probable that state law error
affected the trial outcome does not mean more likely than not, but merely a
reasonable chance, more than an abstract possibility. (*People v. Superior
Court (Ghilotti)* (2002) 27 Cal.4th 888, 918 (*Ghilotti*).)

If a single juror would have voted differently to create a hung verdict,
that result would have been more favorable than a conviction. (See, e.g.,
*People v. Flood* (1998) 18 Cal.4th 470, 490-491 [utilizing *Watson* standard,
question is whether any rational juror, properly instructed, could have found
in favor of defendant].) A reasonable chance exists that this jury would have
reached such a more favorable verdict if the jury had not heard the prosecutor
accuse defense counsel of humiliating and degrading Celia, actions that arose
from defense counsel's Neanderthal-type thinking that causes domestic
violence, requiring reversal under the *Watson* standard, as interpreted by
*Ghilotti.*

## F. Conclusion

For these reasons, the prosecutorial misconduct that occurred in this
case raises important questions of law that should be resolved. Appellant
respectfully requests that this court grant review.

18

**II**

**The Five-Year Section 12022.7, Subdivision (d), Enhancement Should Be Stricken from Appellant's Attempted Voluntary Manslaughter Conviction Because That Offense Is Implicitly Included in the Subdivision (g) Exception for Manslaughter Convictions**

Section 12022.7, subdivision (g) ("12022.7"), precludes imposition of a 12022.7 enhancement for the completed crimes of murder, manslaughter, or arson. It is incongruous to apply these enhancements on the attempts to commit these crimes because of the fundamental principle of California sentencing law that limits the punishment for attempted crimes to one half of the term of the completed crime. That limit is required by application of section 664, that the Legislature enacted in 1872.

California courts have in the past considered and rejected this issue. The most comprehensive and recent discussion occurred in *People v. Lewis* (1993) 21 Cal.App.4th 243 (*Lewis*), in which the Acting Presiding Justice dissented to argue that the subdivision (g) exceptions to 12022.7 should apply to attempted voluntary manslaughter.

Since the *Lewis* decision, additional great bodily injury enhancements have been added to 12022.7 with increased punishments that significantly affect the comparison of punishment for the completed crime without the excluded enhancement to punishment for the attempted crime with a 12022.7 enhancement. These increased punishments strengthen arguments that the

19

exceptions in 12022.7, subdivision (g), should include attempts to commit the crimes listed there. (See § 12022.7, subd. (b) [5 years]; subd. (c) [5 years]; subd. (d) [4-5-6 years]; (e) [3-4-5 years].)

The following charts exhibit how the disparity in punishment has increased with the new enhancements in the attempted voluntary manslaughter context.

**Comparison Based on Standard Three-Year 12022.7,**
**Subdivision (a) Enhancement**
(Same anomaly considered by *Lewis* in 1993)

| Term | Voluntary Manslaughter (no GBI Enh) | Attempted Voluntary Manslaughter with GBI Enh |
|---|---|---|
| Low | 3 years | 4.5 years |
| Middle | 6 years | 6 years |
| Upper | 11 years | 8.5 years |

**Comparison Based on Subsequent Five-Year 12022.7 Enhancements**
**Under Subdivisions (b), (c), (d) [midterm]**
**& (e) [upper term - imposed on appellant]**
(Enhancements Added Since Offense Considered in *Lewis*)

| Term | Voluntary Manslaughter (no GBI Enh) | Attempted Voluntary Manslaughter with GBI Enh |
|---|---|---|
| Low | 3 years | 6.5 years |
| Middle | 6 years | 8 years |
| Upper | 11 years | 10.5 years |

20

The Opinion rejected this issue based on the language of subdivision (g) that excepts only murder, manslaughter, and arson from application of the enhancements in subdivisions (a) through (e). (Opn. 17.) The Opinion also noted the prior courts (before *Lewis*) that had also rejected the issue. (Opn. 17-18.) But those courts also did not consider the increased subsequent enhancements which increase the disparity in punishment.

The Opinion also argued that because appellant received 10 years and 6 months for the attempt, and would have received 11 years for the completed crime, that no incongruous sentence resulted. (Opn. 18.) This conclusion glosses over the principle that attempts should be limited to one-half the completed crime, a principle that, if applied here, would have reduced appellant's sentence by five years.

An upper-term defendant such as appellant does get six months less time than if the victim of domestic violence died. The difference between 11 years and 10.5 years, however, radically violates the fundamental sentencing structure of section 664 which mandates that attempts are punished with half the time imposed for the completed crime, unless greater time for the attempted crime is explicitly authorized.

Finally, the Opinion argues that the post-*Lewis* amendments to 12022.7 suggests the Legislature's approval of the *Lewis* majority's decision. (Opn. 18-19.) When tested by logic and common sense, that conclusion is absurd.

21

Did the Legislature intend that a low-term defendant who inflicted injuries that resulted in a coma or permanent paralysis to get less than half of the punishment of the attempted crime if the victim died instead of lived? (§ 12022.7, subd. (b).) Did the Legislature intend that a mid-term defendant who inflicted great bodily injury on someone 70 years of age or older to get two years less punishment if the victim died instead of lived? (§ 12022.7, subd. (c).) The same questions arise concerning a mid-term defendant who inflicted great bodily injury on a child under five. (§ 12022.7, subd. (d).) The answer to each of these questions is no.

Whether the 12022.7 enhancements should apply to the attempted crime of murder, manslaughter, and arson, raises important questions of law because their application violates a fundamental principle of California sentencing law. This court should grant review to resolve this issue.

## III

**Imposition of the Upper Term on Both the Conviction and its Great Bodily Injury Enhancement Based on Aggravating Facts Determined by a Judge by a Preponderance of Evidence Violated Appellant's Fifth, Sixth, and Fourteenth Amendment Rights to Jury Trial and Due Process Because These Aggravators Were Never Alleged, Admitted, Decided by the Jury, Defined by Instructions, or Proved Beyond a Reasonable Doubt**

### A. Introduction

In the instant case, the trial court imposed the high term on both the attempted voluntary manslaughter conviction and the 12022.7, subdivision (e), enhancement based on appellant's seven prior misdemeanor convictions, as well as the fact that one of them involved the same victim. Appellant's jury did not determine these sentence-increasing facts.

### B. Federal Constitutional Law

The Fifth Amendment mandates that no person shall "be deprived of life, liberty, or property without due process of law . . . ." and the Fourteenth Amendment prohibits any state from depriving a person of liberty without "due process." The Sixth Amendment commands that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury." Taken together, these amendments "require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable

23

doubt." (*United States v. Gaudin* (1995) 515 U.S. 506, 510 [115 S.Ct. 2310, 132 L.Ed.2d 444]; *Sullivan v. Louisiana* (1993) 508 U.S. 275, 277-278 [113 S.Ct. 2078, 124 L.Ed.2d 182].)

In *Cunningham v. California* (2007) 549 U.S. 270 [127 S.Ct. 856, 861-871, 166 L.Ed.2d 856] (*Cunningham*), the United States Supreme Court held that the manner in which upper terms are imposed under California law, specifically section 1170 (determinate sentencing) and California Rules of Court, rules 4.420 (selection of base term) and 4.421[8/] (circumstances in aggravation), violates the Sixth and Fourteenth Amendments. This California sentencing scheme (under which appellant was sentenced to the upper term for both his sentence and enhancement) deprives the defendant of a jury trial on the facts which must be found to justify an upper term choice, and also denies the defendant the right to have such facts found true beyond a reasonable doubt. (*Cunningham*, 127 S.Ct. at pp. 868, 871.)

*Cunningham* criticized the California Supreme Court's decision in *People v. Black* (2005) 35 Cal.4th 1238 for its failure to recognize the controlling authority of *Blakely v. Washington* (2004) 542 U.S. 296 [124 S.Ct. 2531, 159 L.Ed.2d 403] (*Blakely*) and *Apprendi v. New Jersey* (2000) 530 U.S.

---

[8/]Further unspecified rule references are to the California Rules of Court.

24

466 [120 S.Ct. 2348, 147 L.Ed.2d 435] (*Apprendi*). (*Cunningham*, 127 S.Ct.

at pp. 868-871.)

*Cunningham* applies to this case because it was decided while this case

is "pending on direct review or not yet final." (*Griffith v. Kentucky* (1987) 479

U.S. 314, 328 [107 S.Ct. 708, 93 L.Ed.2d 649].)

## C. Application of Law

In *Cunningham*, the United States Supreme Court reiterated the "bright-

line rule" previously announced in *Apprendi* and *Blakely*:

> [T]he Federal Constitution's jury-trial guarantee proscribes a
> sentencing scheme that allows a judge to impose a sentence
> above the statutory maximum based on a fact, other than a prior
> conviction, not found by a jury or admitted by the defendant.

(*Cunningham*, 127 S.Ct. at p. 860.)

*Cunningham* determined that "the middle term prescribed in

California's statutes, not the upper term, is the relevant statutory maximum."

(*Id.*, 127 S.Ct. at p. 868.) "If the jury's verdict alone does not authorize the

sentence, if, instead, the judge must find an additional fact to impose the

longer term, the Sixth Amendment requirement is not satisfied." (127 S.Ct. at

p. 869, citing *Blakely* at p. 305 & fn. 8.)

The *Cunningham* court critically viewed the actions of a California trial

judge in finding aggravating circumstances to impose an upper term:

> Factfinding to elevate a sentence, our decisions make plain, falls
> within the province of the jury employing a beyond-a-

25

> reasonable-doubt standard, not the bailiwick of a judge determining where the preponderance of the evidence lies.

(127 S.Ct. at p. 870.)

While the instant trial court suggested that it was relying on appellant's "prior record" and noted his seven misdemeanor convictions, the court went beyond constitutional limits in considering other aggravating factors such as his probation status while he committed six of them, as well as finding that the same victim was involved in one. (6 RT 3632-3633.)

**D. The federal constitutional right to trial by jury guaranteed by the Sixth and Fourteenth Amendments prohibited the trial judge from increasing the terms on his sentence and enhancement above their statutory maximums, even if based on prior convictions.**

The exception for the "fact of a prior conviction" derives from *Almendarez-Torres v. United States* (1998) 523 U.S. 224 [118 S.Ct. 1219, 140 L.Ed.2d 350] (*Almendarez-Torres*). *Almendarez-Torres* noted that a prior conviction "is a traditional basis, if not the most traditional for a sentencing court's increasing an offender's sentence." (*Almendarez-Torres* at p. 243.) The court noted a longstanding tradition that recidivism is not an element, but goes only to punishment (*id.* at p. 244), concluding that recidivism was not an element of the offense (*id.* at p. 247).

Only a bare majority of the court supported this holding. Four justices (Scalia, Stevens, Souter, and Ginsburg) dissented, concluding that it was a matter of serious doubt whether "the Constitution requires the recidivism

26

finding in this case to be made by a jury beyond a reasonable doubt." (*Id.* at p. 260 (dis. opn. of Scalia, J.)

*Apprendi* described *Almendarez-Torres* as "at best an exceptional departure from the historic practice" of having a jury determine the facts necessary for sentencing. (*Apprendi* at p. 487.) *Apprendi* characterized *Almendarez-Torres* as based partly on the defendant having "*admitted* the three earlier convictions for aggravated felonies -- all of which had been entered pursuant to proceedings with substantial procedural safeguards of their own . . . ." (*Id.* at p. 488.)

Those facts are not present in the instant case. Defense counsel challenged the accuracy of appellant's criminal history in the probation report (6 RT 3609), and repeated that objection after the trial court imposed sentence (6 RT 3636).

*Apprendi* also suggested that "it is arguable that *Almendarez-Torres* was incorrectly decided, and that a logical application of our reasoning today should apply if the recidivist issue were contested [and described *Almendarez-Torres*] as a narrow exception to the general rule . . . ." (*Apprendi* at pp. 489-490, fn. omitted.)

A recent decision of our highest court reaffirms that this exception should be read narrowly. (*Shepard v. United States* (2005) 544 U.S. 13, 24-26 [125 S.Ct. 1254, 161 L.Ed.2d 205.) The *Apprendi* and *Blakely* majorities

27

consisted of Justices Stevens, Scalia, Souter, Ginsburg, and Thomas. A concurrence by Justice Thomas in *Apprendi* explained:

> [O]ne of the chief errors of *Almendarez-Torres* -- an error to which I succumbed -- was to attempt to discern whether a particular fact is traditionally (or typically) a basis for a sentencing court to increase the offender's sentence. [Citation.] . . . [T]his approach just defines away the real issue. What matters is the way by which a fact enters into the sentence.

(*Apprendi* at pp. 520-521 (conc. opn. of Thomas, J.); see also *Shepard v. United States, supra,* 544 U.S. at p. 28 (conc. opn. of Thomas, J., stating that "[i]nnumerable criminal defendants have been unconstitutionally sentenced under the flawed rule of *Almendarez-Torres* . . . .")

Because Justice Thomas was one of the bare 5-4 majority justices that decided *Almendarez-Torres* (and the four dissenting justices in *Almendarez-Torres*, as well as Justice Thomas, remain on the current Court), it appears that a majority of the United States Supreme Court justices no longer support it.

## E. Although this court has decided this issue against appellant since *Cunningham*, it is raised here to preserve it pending future action by the United States Supreme Court.

Last July, this court decided *People v. Black* (2007) 41 Cal.4th 799 ("*Black II*"). *Black II* held that there is no constitutional violation as long as the sentencing court relied on at least one aggravating factor that was constitutionally valid under *Apprendi, Blakely, and Cunningham.* (*Black II, supra,* 41 Cal.4th at p. 812.) In addition, *Black II* broadly interpreted the

28

"prior conviction" exception to *Apprendi-Blakely-Cunningham* rights which was set forth (but is now in doubt) in *Almendarez-Torres*. (*Black II, supra,* 41 Cal.4th at p. 818-820.)

Appellant recognizes that *Black II* is binding on this court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Under *Black II*, the trial court's reliance on appellant's prior convictions was sufficient to impose the upper terms. (6 RT 3632-3633.)

Appellant believes that *Black II* was wrongly decided and will ultimately be overruled by the United States Supreme Court for the reasons stated above. Because the law continues to be in a state of flux, appellant raises this issue here to preserve it for further review.

## IV

**The Trial Court Abused its Discretion in Adding Three and a Half Years to Appellant's Sentence by Imposing the Upper Term on His Attempted Voluntary Manslaughter Conviction and its Domestic Violence Great Bodily Injury Enhancement Based on Appellant's Prior Convictions**

The trial court used the same seven misdemeanor convictions to impose the upper term on both the underlying offense and the enhancement. (6 RT 3632.) These misdemeanors were primarily for minor offenses committed years before the instant offense. (CT 41-43.)

The most recent misdemeanor was committed more than 6 years before the instant offense; the oldest was committed more than 13 years before. All

29

of appellant's prior offenses were committed between 1990 when he was 23, and 1997 when he turned 30. The jail time initially imposed on these offenses ranged from none to 45 days. (CT 37.) Five of the seven misdemeanors were Vehicle Code violations. From 1997 until the instant offense in 2004, there were no convictions. (CT 41-43.) Imposing the upper terms on the offense, as well as the enhancement, substantially lengthened Rocky's sentence from eight to eleven and a half years, an increase of nearly 45 percent. (AOB 89.)

While the trial court has broad discretion in sentencing, that discretion is not without limits. It may not be exercised arbitrarily or capriciously. (*People v. Jordan* (1986) 42 Cal.3d 308, 316.) This court has also noted that "courts have never ascribed to judicial discretion a potential without restraint. . . . All exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue." (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977.)

The trial court's decision to impose both upper terms was not grounded in reasoned judgment or guided by appropriate legal principles and policies. Rule 4.421(a), includes circumstances in aggravation that relate to the current crime. Rule 4.421(b) includes aggravators that relate to the defendant. Section (b)(2) pertains to prior convictions: "The defendant's prior

30

convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness."

Given that all of the convictions were for misdemeanors, there is little support in the record for increasing seriousness. The current offense could not be considered in this rule 4.421(b)(2) evaluation because characteristics of the current offense are included as aggravators in subdivision (a) of that rule. While the probation report listed seven misdemeanors, they were of little gravity and all had occurred between 1990 and 1997. The instant offense did not occur until 2004.

California reviewing courts have not blindly relied on the number of minor offenses that a trial court used to impose an upper term. In *People v. Piceno* (1987) 195 Cal.App.3d 1353 (*Piceno*), the defendant was convicted of vehicular manslaughter and sentenced to the upper term of four years. Piceno had struck a pedestrian who was standing 20 feet off the road when his car skidded while trying to negotiate a curve at a reckless speed. Piceno had a beer can between his legs at the time of the accident, failed a field sobriety test and a blood alcohol level test, and admitted he had been drinking beer and smoking marijuana with his friends in the car. (*Id.* at p. 1355.)

Piceno pleaded guilty. In exchange, all other charges (for reckless driving and excessive speed) were dropped. (*Id.* at p. 1355.) Among the aggravators noted by the trial court, the court cited rule 4.421(b)(2), finding

31

that "the defendant has an extensive juvenile record, even though minimal."

(*Id.* at p. 1356.)

Like appellant, Piceno had seven minor prior offenses. (*Id.* at p. 1360.)

The *Piceno* court reasoned that this prior record was not sufficient as a matter

of law to support the upper term, even though admitting that the prior

convictions were numerous:

> As to his juvenile record, the half dozen or so entries are indeed
> numerous. But the offenses are either stale -- occurring as much
> as five years previously when Piceno was 13 years old -- or
> minor -- the last two being misdemeanors that are often either
> treated as infractions or made subject to diversion.
>
> Under these facts, we find Piceno's juvenile record standing
> alone is insufficient as a matter of law in a case of vehicular
> manslaughter without gross negligence to aggravate the
> sentence. Hence, we find the trial court has not articulated a
> proper aggravating factor in this case.

(*Id.* at pp. 1360-1361, statutes omitted.)

On these similar facts, the *Piceno* court remanded for resentencing. In

the instant case, the Court of Appeal, however, stated that "[t]here is no

comparison to be drawn between the present case and *Piceno*." (Opn. 21.)

This assertion does not appear to be supported by the criminal history of

appellant or that considered by the *Piceno* court, or any fair comparison

between them.

The trial court's use of appellant's misdemeanor criminal history to

impose these upper terms increased his sentence by almost 45 percent. For

these reasons, the trial court abused its discretion in sentencing appellant to the upper terms of the enhancement and its underlying offense.

Whether the trial court abused its discretion in imposing these aggravated terms based only on an insignificant criminal record made up of misdemeanor convictions, most of which were Vehicle Code violations which occurred long before the instant offense, constitutes an important question of law. Appellant respectfully requests grant of review to consider this issue.

**V**

**Defense Counsel's Failure to Object to the Trial Court's Sentencing Decision to Impose the Upper Terms Deprived Appellant of His Sixth Amendment Right to Effective Assistance of Counsel**

**A. Introduction**

The Opinion provided a cursory rejection of this issue in a footnote appended to its analysis of the *Cunningham* issue (Issue III). (Opn. 19, fn. 16.) The Court of Appeal concluded that since the trial court had properly imposed the upper terms based on appellant's prior convictions, any failure to object on *Blakely* grounds was not ineffective assistance, but a correct assessment of the law. (*Ibid.*)

For the reasons explained above, appellant has preserved the *Blakely* issue of whether it was constitutionally permissible for the trial court to determine the aggravating factors used to impose the upper terms, even if those

33

factors related to prior convictions. For that reason, the ineffective assistance issue is also preserved here.

## B. Factual Background

Before the court sentenced appellant, defense counsel had discussed the relevance and weight of appellant's prior criminal history (6 RT 3604-3605, 3627), and also asserted that *Blakely* prohibited imposition of the upper terms (6 RT 3605-3607, 3612, 3626, 3628-3631). After the court ruled, however, defense counsel stated that his objection to the priors was not based on *Blakely*, but instead on the prosecution's failure to prove them.

## C. Legal Background

Effective assistance of counsel is guaranteed to criminal defendants by the Sixth and Fourteenth Amendments of the United States Constitution. That guarantee extends to sentencing proceedings. (*In re Perez* (1966) 65 Cal.2d 224, 229-230.)

The United States Supreme Court has recognized that a defendant's need for counsel may be greatest at sentencing because a sentencing judge often "moves within a great area of discretion." (*Carter v. Illinois* (1946) 329 U.S. 173, 178 [67 S.Ct. 216, 91 L.Ed. 172]; see also *People v. Cotton* (1991) 230 Cal.App.3d 1072, 1085; *People v. Cropper* (1979) 89 Cal.App.3d 716, 719.) Counsel's failure to object and preserve the record for appeal can

34

constitute ineffective assistance. (See, e.g., *People v. Jackson*[2/] (1986) 187 Cal.App.3d 499, 506 [counsel's duty to preserve potentially meritorious objections even without belief they would be sustained in trial court].)

In *People v. Scott* (1994) 9 Cal.4th 331, 353, this court concluded that "the waiver doctrine should apply to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices."

In the Court of Appeal, appellant asserted that defense counsel's discussion of appellant's criminal history before the court ruled constituted an advance objection which preserved the constitutional issues raised here in Issue III. (AOB 96.) Defense counsel's arguments fulfilled the purposes of the waiver doctrine, which "is to bring errors to the attention of the trial court so they may be corrected or avoided. . . . " before they reach the Court of Appeal. (*People v. Gibson* (1994) 27 Cal.App.4th 1466, 1468.)

**D. Application of Law**

Both federal and California courts evaluate ineffective representation under the two-pronged test of *Strickland v. Washington* (1984) 466 U.S. 668 [104 S.Ct. 2052, 80 L.Ed.2d 674] (*Strickland*).

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel"

---

[2/]*Jackson* was overruled on other grounds in *People v. Jones* (1991) 53 Cal.3d 1115, 1144.

35

> guaranteed the defendant by the Sixth Amendment. Second, the
> defendant must show that the deficient performance prejudiced
> the defense.

(*Id.* at p. 687.)

Reviewing courts have found ineffective sentencing representation on

direct appeal without new evidence provided by trial counsel via habeas. (See,

e.g., *People v. Cropper, supra,* 89 Cal.App.3d 716, 721 [holding counsel was

ineffective at sentencing for failing to object to probation officer's probation

recommendation].) When the record sheds no light on why counsel acted or

failed to act in a certain manner, relief may be granted if there simply could be

no satisfactory explanation for counsel's action or inaction. (*People v. Pope*

(1979) 23 Cal.3d 412, 426; accord, *People v. Mendoza Tello* (1997) 15 Cal.4th

264, 266.) In such a case, the defendant must show on appeal that the act or

omission of trial counsel involved a critical issue and cannot be explained on

the basis of any knowledgeable choice of tactics. (*People v. Stratton* (1988)

205 Cal.App.3d 87, 94.)

Defense counsel could not provide any satisfactory explanation for

failing to object and preserve these issues that he had argued at sentencing.

There also can be no dispute that appellant's criminal history was a critical

issue as the trial court used it to increase his sentence by nearly 45 percent.

36

## E. Conclusion

Assuming arguendo, that defense counsel's pre-ruling argument and post-ruling clarification of his objections were not sufficient to preserve this issue, appellant submits that the trial court's imposition of the upper terms may be addressed through the lens of ineffective assistance. Counsel's failure to preserve these issues pursuant to the1994 *Scott* decision was both deficient and prejudicial, meeting both prongs of the *Strickland* test. Because failing to preserve this issue deprived appellant of his Sixth Amendment right to effective representation at sentencing, appellant raises that issue here so that it is preserved for further review.

### Conclusion

This case meets the requirements for review set forth in rule 8.500(b)(1) because it raises important questions of law that should be resolved. Appellant respectfully requests that this court grant review.

Dated: April 25, 2008                    Respectfully submitted,

*G. Richard*

Gregory L. Rickard
Counsel for Appellant/Petitioner
Andaliwa Andrus

37

**APPENDIX A**

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B185016 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. BA260824) |
| ANDALIWA ANDRUS, | |
| Defendant and Appellant. | |

COURT OF APPEAL - SECOND DIST.

F I L E D

MAR 1 9 2008

JOSEPH A. LANE _____ Clerk

_____ Deputy Clerk

APPEAL from a judgment of the Superior Court of Los Angeles County, Charlaine F. Olmedo, Judge. Affirmed.

Gregory L. Rickard for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Chung L. Mar and Susan S. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Andaliwa Andrus appeals from the judgment following a jury verdict convicting him of one count of attempted voluntary manslaughter (Pen. Code §§ 664/192, subd. (a)),[1] and finding true the allegations that he personally inflicted great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)) and personally used a deadly and dangerous weapon (§ 12022, subd. (b)(1)).[2] He was sentenced to state prison for a total term of 11 years, 6 months (the upper term of 5 years, 6 months for attempted voluntary manslaughter, plus the 5-year upper term for the great bodily injury enhancement and one year for the deadly weapon enhancement). Defendant contends: (1) prosecutorial misconduct during closing argument requires reversal of his conviction; (2) imposition of the great bodily injury enhancement under section 12022.7, subdivision (e), was improper because attempted voluntary manslaughter is excluded from section 12022.7 by subdivision (g), which provides in relevant part that the section "shall not apply to . . . manslaughter"; (3) imposition of the upper term for attempted voluntary manslaughter and infliction of great bodily injury violates *Cunningham v. California* (2007) 549 U.S. __ [127 S.Ct. 856, 166 L.Ed.2d 856]; (4) the trial court abused its discretion in imposing the upper terms on the basis of defendant's prior misdemeanor record; and (5) trial counsel was ineffective for failing to object that the trial court's reliance on defendant's prior record in sentencing violated *Blakely v. Washington* (2004) 542 U.S. 296. Finding none of defendant's arguments persuasive, we affirm.

---

[1] All undesignated section references are to the Penal Code.

[2] Defendant was charged with three counts: attempted first degree murder (§§ 664/187, subd. (a)), inflicting corporal injury to a spouse or cohabitant (§ 273.5, subd. (a)), and assault with a deadly weapon (§ 245, subd. (a)(1)). The jury acquitted defendant of attempted first degree murder, convicted him of attempted voluntary manslaughter as a lesser included offense, and acquitted him of the remaining charges.

2

## STATEMENT OF FACTS

1. *The Prosecution's Case*

Celia Escobar and defendant had known each other since 1995. Although they had never lived together, they had one child, Eddason[3] who was eight years old when the crime was committed. They shared custody of their son.

During the morning of February 17, 2004, Escobar brought Eddason to the home of defendant's mother, Asilah Shakoor. Escobar and defendant spoke briefly, intending to meet later that morning at defendant's home. Defendant left, taking Eddason to school. Escobar stayed briefly at Shakoor's home before driving to defendant's house. Defendant was home. She asked him to show her papers relating to dates Eddason would attend camp. Defendant handed her a paper. Escobar looked at it, commenting: "This doesn't make sense." As she turned to speak to defendant, defendant grabbed a telephone cord and wrapped it around her neck. He held the cord tightly, lifting her up from the seat. He said: "Today you will die. Today is your day to die." The two struggled and Escobar was able to release the telephone cord. Defendant punched her many times in the face with his fist. As Escobar tried to crawl away, he stabbed her multiple times in the chest with a pocket knife, causing her to pass out.

When Escobar regained consciousness, defendant was standing over her. He said "Oh, you are not dead. Don't worry. I will take care of that right now" and proceeded to stab her again with the pocket knife. Escobar tried to fight back and to reach the front door. Defendant pinned her to the floor, bound her feet with

---

[3]    The reporter's transcript spells the child's name as "Edison" but the parties agree that the correct spelling is "Eddason."

3

telephone cord, and continued to stab her. Defendant then retrieved a long knife and stabbed Escobar in the stomach and cut her throat. He placed plastic bags on her head and again stabbed her in the stomach. She pretended to be dead. Soon thereafter, defendant left his house.

Escobar crawled out of the home and cried for help. Neighbors came to her aid and contacted 911. An ambulance transported Escobar to the hospital. She had suffered multiple life-threatening stab wounds. She underwent three surgeries and remained in the hospital for eight days.

The police arrested defendant that afternoon. That day, a criminalist removed a plethora of evidence from defendant's home corroborative of Escobar's testimony. On February 23, the police conducted a videotaped interview of Escobar at the hospital, following which a search warrant was obtained for defendant's home. (The videotape was not entered into evidence.) When the police executed the warrant, they found further evidence corroborative of Escobar's testimony.

2. *The Defense Case*

Defendant testified on his own behalf and admitted that he had stabbed Escobar.[4] He claimed that he had done so after Escobar had told him that her boyfriend Patrick Reagan was moving in with her and Eddason. Defendant became enraged because he believed Reagan had been sexually molesting Eddason. According to defendant, Eddason had told both him and Shakoor that Reagan was molesting him. Defendant believed Eddason because the child had acted in inappropriate sexual ways with other children. Defendant testified that he

---

[4]    Defendant denied some of the particulars of Escobar's testimony but none of them is relevant to the issues raised on appeal.

4

had made multiple efforts to stop Reagan's molestation of Eddason. These efforts included including informing the police, contacting Eddason's school, and going to family court. None of them had been successful.

Defendant's concern about Reagan was exacerbated by the fact that several years earlier, Escobar's brother had raped Eddason and that his (defendant's) subsequent contact with the police and other authorities had done nothing to stop that molestation. Defendant explained that he had stabbed Escobar to protect Eddason by preventing Escobar from permitting Reagan to move in with her and Eddason. Defendant had not planned to kill Escobar.

To further explain his state of mind on the day of the stabbing, defendant testified that he had confronted Escobar about Eddason's statements that she had forced him to eat out of the trash can. According to defendant, Escobar replied "it was not that big a deal" since it was only fruit.

Defendant did not present evidence to corroborate his claim that Eddason had been sexually molested because the trial court had ruled such evidence would not be admitted. The court instructed the jury that defendant's testimony about the (alleged) molestations of Eddason by Reagan and Escobar's brother was offered only to establish defendant's state of mind, not as proof that the molestations had occurred.[5]

To further impugn the prosecution case, the defense suggested Escobar had a financial motive to have defendant convicted: she had filed a lawsuit against defendant, defendant's mother (Shakoor) and defendant's stepfather based upon the attacks. The lawsuit, filed on September 9, 2004, alleged that Shakoor and her

---

[5]     Defendant's appeal does not challenge the trial court's ruling barring proof that Eddason had been molested. Nor does he challenge the court's pre-trial ruling that it would not instruct about the complete privileges of necessity or defense of others.

5

husband were liable because they owned the house in which defendant had attacked Escobar and that they knew or should have known of defendant's violent propensity.[6] The lawsuit sought compensatory and punitive damages.

### 3. *Jury Instructions*

The trial court submitted the pattern instructions defining the charged crimes and all lesser included offenses, including attempted voluntary manslaughter.

# DISCUSSION

## A. PROSECUTORIAL MISCONDUCT

Defendant claims that the prosecutor committed multiple acts of misconduct during closing argument requiring reversal. We find no prejudicial misconduct.

### 1. *Factual Background*

Immediately before the parties presented their closing arguments, the court told the jury: "The attorneys in making these arguments to you will be commenting upon the testimony that you have heard and evidence that was presented in this case. [¶] Please keep in mind that what they say is not evidence." (After argument, the court submitted the pattern instructions that counsel's statements are not evidence and the jury is to base its decision on the facts and the law.)

The opening portion of the prosecutor's closing argument simply applied the facts to the law and asked the jury to find defendant guilty of the three charged crimes. The prosecutor urged that the evidence did not support a finding of

---

6     Pursuant to defense counsel's request, the complaint, which was entered into evidence at trial, has been transmitted to this court. (Cal. Rules of Court, rule 8.224(b).)

6

attempted voluntary manslaughter, the verdict that he claimed the defense sought.[7] The prosecutor characterized the defense's in-court treatment of Escobar as "humiliation and degradation." Defense counsel did not object to that statement.

Defense counsel's closing argument largely failed to address the relevant facts and law. In his few references to attempted voluntary manslaughter, he disagreed with the prosecutor's claim that the defense sought a conviction of that offense[8] and, in fact, explicitly disavowed seeking such a verdict.[9] Other than a

---

[7]    When the prosecutor began to discuss the concept of heat of passion, he stated: "This whole case boils down to this. . . . [B]asically the defense is making a play for this. They want you to come back with this. They want you to find that [defendant] was operating under a heat of passion when he attempted to kill Celia Escobar. [¶] This is the whole ball game. This is what they want. If they get it, they win. We lose. . . . This is what all the marbles are for."

[8]    Defense counsel explained it as follows: "He argued if they get this, they're the winners; we're the losers. That is just absolutely, positive 100 percent not true. [¶] There is a little boy [Eddason] in this case who the prosecutor doesn't want to talk about. The prosecutor doesn't want to believe you to think about him. The prosecutor wants to ignore him. The prosecutor wants to pretend that that little boy doesn't exist. [¶] And ultimately it is easy to call [defendant] a big liar, but it is rather difficult to address the fact that the person who facilitated a little boy being molested over and over is being propped up by the District Attorney's office as the saint."

[9]    Defense counsel stated: "The idea that he [the prosecutor] tells you that what the defense wants – defense wants you to come back with this attempted voluntary manslaughter. That is the whole ball game. He told you that is what the defense wants. That is a lie. [¶] To walk back and to convict this man of defending his child and putting millions of dollars in Celia Escobar's pocket[,] attempted voluntary manslaughter, attempted jay walking, attempted anything with a conviction behind it, *I don't want anything to do with because it would be immoral to me.*" (Italics added.)

7

passing, unfocused reference to the concept of heat of passion,[10] defense counsel did not rely upon the legal principles set forth in the jury instructions.

Instead, defense counsel's closing argument proceeded on the unproven assumption that Eddason had been molested. Building on that premise, he implicitly argued for jury nullification on the theory that defendant should not be punished for trying to protect his son from sexual abuse.[11] Appealing to the passion of the jury, he not only spoke about the importance of protecting children

---

[10] Defense counsel stated: "Unimaginable situations create unimaginable results. Then when unimaginable results happen, I do think it is fair to ask you to look at the circumstances surround it and sit there and say was this man moved by the heat of passion? Was he attempting to protect his son? And right now, I am done."

[11] For instance, defense counsel argued: "[W]hen a prosecutor . . . talks about the law, it always reminds me that in 1971 I couldn't have been here because I am part black and part white and that was against the law." The prosecutor objected and the court directed defense counsel to move on. Nonetheless, defense counsel continued: "When the prosecutor doesn't have a factual leg to stand on, a moral leg to stand on, they argue the law. It was the law that we can own black people, we can own women." After the prosecutor again objected, defense counsel went on to say: "It was the law in other countries that they killed certain ethnic groups. *Because it is the law, it does not make it just and it does not make it right* and it does not mean that it is okay to hide from what really is at issue in this case." (Italics added.)

Later on, defense counsel stated: "When the prosecution asked you to find my client – punish my client to the fullest extent of the law, *there are different types of laws I suggest to you. I don't care what Hitler said to me, I am not going to do it.* [¶] I don't care what anybody says to me about harming a child, I am not going to do it. It is a question of conscience." (Italics added.) At another point, he stated: "[T]he realm of reality that many of us deal with . . . is doing the right thing. Not the popular thing, but the right thing, the just thing." Later on, he explained: "I would like to believe that we understand that it is sometimes time to do it or sometimes do the right thing. *I wonder about the law. I wonder about the right thing.* And also you do have to put yourself in that man's shoes no matter how painful it is." (Italics added.)

8

from molestation but lauded vigilantism.[12] In addition, defense counsel vouched for his own credibility and stated that the prosecutor had lied to the jury.

Defense counsel also urged that the prosecutor had falsely represented that there was a videotape of the interview Detective Elva Soriano had conducted with Escobar on February 23, 2004. Relying upon the fact that no videotape had been produced at trial, defense counsel called the representation a lie.

The prosecutor began his rebuttal argument by stating that the People "would have been more than happy to litigate" whether Eddason had been molested but that the trial "court ruled that it was not proper . . . to get into that." The trial court sustained defense counsel's objection to the remarks and directed the prosecutor to move on. Shortly thereafter, the prosecutor stated: "The defense told you at the beginning of their case they were going to prove that [Eddason] had been molested. Did they put on any proof of that? [¶] [Defense counsel's] whole argument was laced with things that were not true which he knew that he could never prove." Defense counsel objected. The court overruled the objection, telling the jury to "keep in mind the court's admonition."

---

[12]   For instance, defense counsel stated there "is a recognition that *there is a dignity above what a prosecutor tells you is the law*. There is a dignity in something that is created in my opinion by a higher power that bestows a little boy or little girl with the power to say, Daddy I love you, Mommy, I love you; but incumbent on that is duty to what? To protect that child." (Italics added.) Later on, he  argued: "[W]hat I am asking you to do is to recognize the thousands and thousands of lives that are destroyed when people use children. [¶] I believe it should stop. Everyone believes it should stop. I remember when Ellie Nesler was in Stockton. Pulled out a gun and shot a guy who molested her kid in the head three times or four times. I had a bumper sticker that said, 'Great Shooting Ellie.'"

   In his concluding remarks, defense counsel explained: "I hope it never happens to me. But if something like this ever happened to one of my children, I will tell you flat out any time, anywhere, any place I see that man or woman[,] adult, old, young who did that to one of my children whether it is a car, truck, a knife[,] an axe, a bat, she is going to get it."

9

The prosecutor also addressed defense counsel's claim that he (the prosecutor) had falsely stated there was a videotape of the February 23 interview with Escobar. He argued that "the officer [Detective Soriano] told you that there was a videotape. And if the court would have allowed it, we would have played it." The court sustained defense counsel's objection to the argument and instructed the jury: "[K]eep in mind that what the attorneys say is not evidence. You remember what the evidence is."

The prosecutor next argued that defense counsel had emphasized Eddason's molestation because he did not want to address the facts of this case. The prosecutor continued: "[B]ut what he wants to tell you and he says it very clearly is that Celia Escobar deserved to get her throat cut. And he just said it. She deserved it. She deserved to get her throat cut. What else did he say? He just sat up here and told you be careful what you wish for you might get it. [¶] *This is the kind of Neanderthal thinking that gets women abused and victims of domestic violence. . . .* This is the guy that doesn't get it. He is so lost, he can't see the forest through the trees. And he is going to sit up here and tell you that doesn't like to hear his own voice. That is all he wants to do is hear his own voice. He just loves to hear himself talk and pat himself in the back and not deal with the facts in this case." (Italics added.) Defense counsel objected that it was "prosecutorial misconduct to attack an attorney." The court overruled the objection. When the prosecutor continued to mock defense counsel, the court interrupted and told him to address the facts of the case. Soon thereafter, the prosecutor tried to imitate defense counsel's voice tone. Defense counsel objected. The court directed the prosecutor to address the facts and lower his voice.

At the end of his argument, the prosecutor stated that Escobar had "stood up to some horrific . . . questioning and humiliation by the defense, but told you the truth." Defense counsel objected. The court told the jury to disregard the

10

statement and directed the prosecutor to address the facts. The prosecutor, without any objection from defense counsel, told the jury that Escobar had told the truth and asked that it find defendant guilty of all charges.

After the jury returned with its verdicts, the defense moved for a mistrial based upon prosecutorial misconduct. The trial court denied the motion for two reasons. It first found that "with regard to the arguments . . . many of the objections that [defense] counsel made, . . . were sustained by the court with an admonition to follow." It then explained that the ultimate inquiry was whether defendant was prejudiced which it defined "to mean would there be a different result, or would a different result have been likely?" The court reasoned that because defendant had testified and "admitted to stabbing [Escobar] and physically harming her[,] . . . based upon the law that the court did instruct the jurors on, that the best result under these circumstances would have been attempted voluntary manslaughter based upon the provocation, and that was in fact what the jury returned a verdict of. So that was the best result that could have happened for [defendant], and that's what he got here. [¶] . . . So the motion for a new trial is denied because I don't believe there is any prejudice in this case. I don't believe that different result would have been likely."

4. *Analysis*

Two of defendant's claims of prosecutorial misconduct can be quickly dispatched. The first is based upon the prosecutor's statement, made at the end of the first portion of his closing argument, in which he characterized the defense's treatment of Escobar as "humiliation and degradation." Defendant failed to object to that statement. "To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the

11

harm caused by the misconduct." *(People v. Price* (1991) 1 Cal.4th 324, 447.) Even assuming the statement was misconduct, an admonition to the jury to disregard it would have cured any harm.

In a similar vein, defendant's failure to object the very last remark the prosecutor made ("[Escobar] told you the truth.") constitutes a forfeiture of any claim of misconduct. In any event, defendant errs when he characterizes the statement as improper prosecutorial vouching for the victim's credibility. Improper vouching "usually involves an attempt to bolster a witness by reference to facts *outside* the record. [Citation.] Here, the prosecutor properly relied on facts of record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief. [Citations.]" *(People v. Medina* (1995) 11 Cal.4th 694, 757.)

We now turn to the claims of misconduct which have been preserved for appellate review.

The first group involves remarks in which the prosecutor denigrated defense counsel. These include the statements generally mocking him, the statement that he had subjected Escobar to "horrific questioning and humiliation," and the statement that he displayed the type of Neanderthal thinking which leads to physical abuse of women. Defense counsel objected to all of them. "A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel. [Citations.] 'An attack on the defendant's attorney can be seriously prejudicial as an attack on the defendant himself, and, in view of the accepted doctrines of legal ethics and decorum [citation], it is never excusable.' [Citation.]" *(People v. Hill* (1998) 17 Cal.4th 800, 832.) That defense counsel presented improper closing argument, including attacks on the prosecutor's integrity, does not excuse the prosecutor because his remarks went beyond giving a fair response to defense counsel's (improper) argument. *(People v. Frye* (1998) 18

12

Cal.4th 894, 978.) (Whether the comments constitute prejudicial misconduct will be discussed later.)

Defense counsel also objected to the prosecutor's statements that but for the trial court's ruling, he would have litigated whether Eddason had actually been molested. This statement was misconduct. It improperly suggested that the prosecutor could prove no molestation had occurred and it improperly informed the jury about a ruling the trial court had made outside the jury's presence. (See *People v. Hill, supra,* 17 Cal.4th at pp. 827-828, and cases cited therein.) In a similar vein, defense counsel properly objected when the prosecutor stated that he would have produced the videotaped February 23 interview with Escobar had the trial court permitted him to do so. In fact, the record contains no indication that the parties litigated or the court ruled upon the admissibility of the videotape.

Lastly, it was improper for the prosecutor to argue that the defense failed to fulfill a promise made in opening statement that it would prove Eddason had been molested. While the defense had made that promise, the trial court sustained the prosecutor's objection, struck any references to proof of molestation, and instructed the jury to disregard it. Consequently, this was not a situation in which a prosecutor properly highlighted the discrepancies between the defense counsel's opening statement and the evidence; instead, it was a situation in which the prosecutor improperly accused defense counsel of fabricating a defense. (See *People v. Bemore* (2000) 22 Cal.4th 809, 846, and cases cited therein.)

The dispositive question is whether the prosecutor's misconduct requires reversal. It does not.

Defendant first urges the prosecutor's misconduct violated the federal constitution, requiring a showing that the misconduct was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) We disagree. "'A prosecutor's rude and intemperate behavior violates the federal Constitution

13

when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." [Citations.]'" (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214-1215.) Here, while the prosecutor's comments were improper, they did not deprive defendant of a fair trial. The comments were limited to the rebuttal phase of closing argument and the court often sustained the defense objections and admonished the jury or instructed the prosecutor to move on. No due process violation occurred.

Under state law, "a prosecutor who uses deceptive or reprehensible methods to persuade either the court or the jury has committed misconduct, even if such action does not render the trial fundamentally unfair. [Citations.]" (*People v. Frye, supra,* 18 Cal.4th at p. 969.) In that situation, "we determine whether it is 'reasonably probable that a result more favorable to the defendant would have occurred' absent the misconduct." (*People v. Welch* (1999) 20 Cal.4th 701, 753.)

Here, we conclude, as did the trial court, that the prosecutorial misconduct was not prejudicial. The jury acquitted defendant of two charges (inflicting corporal injury on his son's mother and assault with a deadly weapon) and their lesser included offenses. In addition, it acquitted defendant of attempted first degree murder and instead convicted him of the lesser included offense of attempted voluntary manslaughter. Hence, the inquiry is whether it is reasonably probable that absent the misconduct, defendant would have been acquitted of attempted voluntary manslaughter. On this record, it is not because there was absolutely no basis in law or fact to acquit him of that offense. By his own testimony, defendant admitted that he had attacked Escobar; hence, identity of Escobar's assailant was not in issue. And on appeal, defendant does not contend that the record fails to contain substantial evidence to support his conviction. Because there was no basis upon which a jury could entertain a reasonable doubt

14

as to defendant's guilt of attempted voluntary manslaughter, its verdict could not have been influenced by the prosecutor's misconduct.

Defendant's contrary argument is not persuasive. Noting that the jury inconsistently acquitted him of the two other charges arising out of the same events,[13] he argues: "Given the willingness of the jury to acquit [defendant] on these charges in spite of the prosecution's evidence, it is more likely that jurors were influenced by the prosecutor's suggestion that the case was all about whether they would deliver a victory to the defense in the form of an attempted voluntary manslaughter conviction. . . . [¶] . . . [I]t is quite likely that jurors believed that their attempted voluntary manslaughter verdict constituted a victory for the defense which would result in only a short time in prison for [defendant]. Under these circumstances, [the prosecutor's] misconduct was the pivotal factor which salvaged a conviction for the prosecution."[14]

Given that there was no basis in law or fact to acquit defendant, this argument proceeds upon the unstated premise that he was entitled to ask the jury for a verdict nullifying his prosecution for attempted first degree murder and that because of the prosecutor's comments, the jury *incorrectly* concluded that conviction of attempted voluntary manslaughter would be such a nullification. In other words, defendant urges he was prejudiced because the prosecutor's

---

[13] One well known treatise explains that such inconsistency can result when "the jury, in deliberate disregard of the law, compromises its disagreements or extends leniency by convicting on one count and inconsistently acquitting on another. [Citations.]" (6 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Criminal Judgment, § 74, pp. 108-109.)

[14] In his opening brief, defendant argues "If a single juror would have voted differently to create a hung verdict, the result would have been more favorable than a conviction" but he fails to explain how, based upon the facts and law, a reasonable juror would have reached that conclusion.

15

misconduct denied him the right to nullification on count one. But "[j]ury nullification is contrary to our ideal of equal justice for all and permits both the prosecution's case and the defendant's fate to depend upon the whims of a particular jury, rather than upon the equal application of settled rules of law. . . . [Therefore,] jurors are required to determine the facts and render a verdict in accordance with the court's instructions on the law." (*People v. Williams* (2001) 25 Cal.4th 441, 463.)

That the jury may well have engaged in nullification in acquitting defendant of the other charges (a reasonable conclusion given the evidentiary record and defense counsel's closing argument) does not establish that his conviction for attempted voluntary manslaughter was improper. Simply stated, defendant obtained more than he deserved with those acquittals. He cannot parlay the prosecutor's misconduct during closing argument into a new trial so that he may again seek an acquittal on an improper basis.

## B.

## ENHANCEMENT UNDER SECTION 12022.7, SUBDIVISION (E)

The trial court sentenced defendant to the upper term of five years, six months for his conviction of attempted voluntary manslaughter, and also imposed the upper term of five years under section 12022.7, subdivision (e), for infliction of great bodily injury under circumstances involving domestic violence. Relying on the dissent in *People v. Lewis* (1993) 21 Cal.App.4th 243, 252-258 (*Lewis*) (Newsom, Acting P.J., dis.), defendant contends that the section 12022.7, subdivision (e), enhancement should be stricken. We disagree.

In substance, the argument set forth by the dissent in *Lewis* (as applicable to the instant case) and urged by defendant here is as follows. Section 12022.7, subdivision (g), precludes imposition of a section 12022.7 enhancement for the

16

completed crime of voluntary manslaughter.[15] Therefore, it would be incongruous to permit such an enhancement for *attempted* voluntary manslaughter. The supposed incongruity flows from section 664, which provides (with exceptions not here relevant) that the punishment for an attempted felony is half the term of imprisonment prescribed for the completed offense. (§ 664, subd. (a).) To permit a section 12022.7 enhancement for an attempt, the argument goes, would violate the principle expressed in section 664 and result in an inordinately long sentence as compared to the completed crime. Therefore, section 12022.7, subdivision (g), should be read to exclude attempted voluntary manslaughter from the section 12022.7, subdivision (e) enhancement.

As pointed out by the majority in *Lewis,* this argument suffers from several fatal flaws. First, it is inconsistent with the plain language of section 12022.7. (*Lewis, supra,* 21 Cal.App.4th at p. 247.) As here relevant, subdivision (e) provides that its enhancement applies to "[a]ny person who personally inflicts great bodily injury under circumstances involving domestic violence in the commission of a felony *or attempted felony.*" (Italics added.) Further, subdivision (g) expressly exempts only murder, manslaughter, and two forms of arson; it does not exempt *attempts* to commit these crimes. "In the face of this clear language, there is no reason to construe section 12022.7 to exempt attempted manslaughter from the enhancement for infliction of great bodily injury." (*Lewis, supra,* 21 Cal.App.4th at p. 247.)

Second, "[o]ther courts have considered the analogous argument that attempted murder must by implication be exempted from the application of [section 12022.7], and uniformly have rejected the proposition." (*Id.* at p. 247; see

---

[15] Subdivision (g) provides in relevant part that "[t]his section shall not apply to murder or *manslaughter* or [arson] in violation of Section 451 or 452." (Italics added.)

17

*People v. Allen* (1985) 165 Cal.App.3d 616, 631; *People v. Wells* (1983) 149 Cal.App.3d 497, 505.) Third, "[t]he legislative histories of sections 12022.7 and 664 do not support an implied exclusion of attempted manslaughter from the application of section 12022.7." (*Lewis, supra,* 21 Cal.App.4th at p. 248.)

Fourth, on the facts presented here, the five-year enhancement of defendant's sentence under section 12022.7, subdivision (e), did not result in an incongruous sentence when compared to the sentence defendant could have received for the completed crime of voluntary manslaughter alone. (See *Lewis, supra,* 21 Cal.App.4th at p. 250.) The upper term for voluntary manslaughter is 11 years (§ 193, subd. (a)), more than the 10 year, 6 month portion of defendant's sentence attributable to his conviction of attempted voluntary manslaughter with the section 12022.7, subdivision (e) enhancement. Moreover, the Legislature could rationally conclude that an attempted voluntary manslaughter in which the victim suffers great bodily injury under circumstances of domestic violence deserves significantly enhanced punishment. Because defendant's sentence for attempted voluntary manslaughter, enhanced by section 12022.7, subdivision (e), is less than that for voluntary manslaughter, and is the result of a rational legislative policy, it cannot be said that defendant's sentence is incongruous. (See *Lewis, supra,* 21 Cal.App.4th at p. 250.)

Finally, defendant argues that the reasoning of the majority in *Lewis* should be reexamined because after "the *Lewis* decision, additional great bodily injury enhancements have been added to [section] 12022.7 with increased punishment," thus making the possible sentences for attempted voluntary manslaughter with the section 12022.7 enhancement even more incongruously long. However, the post-*Lewis* amendments to section 12022.7 suggest the Legislature's *approval* of the *Lewis* majority's decision. "Because the Legislature is presumed to know existing case law, its failure to alter judicial interpretation [of a statute] when it amended

18

the section . . . indicates an intent to leave the law as it stood in the aspects not amended." (*People v. Green* (1996) 50 Cal.App.4th 1076, 1090.) Here, after *Lewis*, the Legislature amended section 12022.7 to add additional enhancements without amending the language of subdivision (g) to exclude attempted voluntary manslaughter from the section 12022.7 enhancements. Thus, the inference to be drawn is that the *Lewis* majority's interpretation of section 12022.7 is consistent with legislative intent. (*Green, supra*, 50 Cal.App.4th at p. 1091.)

## C. *CUNNINGHAM* ERROR

Defendant contends that the trial court's selection of the upper term for the attempted voluntary manslaughter conviction and for the finding that he inflicted great bodily injury violated *Cunningham v. California, supra,* [127 S.Ct. 856; 166 L.Ed. 856]. Assuming (without deciding) that defendant's failure to object on constitutional grounds in the trial court does not forfeit the issue,[16] we disagree. The trial court imposed the upper terms "based upon [defendant's] prior record. He has seven misdemeanor convictions, six of which were committed while under

---

[16]   In the trial court, defense counsel specifically noted that he objected to the use of defendant's prior convictions in sentencing on the ground that the prior convictions had not been proven, not on the ground that consideration of them violated *Blakely v. Washington, supra,* 542 U.S. 296. Defendant argues that trial counsel's failure to object on constitutional grounds under *Blakely* constituted ineffective assistance of counsel. However, as we explain, the court's reliance on defendant's record and related facts was constitutionally permissible. Hence, trial counsel's failure to object on constitutional grounds under *Blakely* was not ineffective assistance, but rather a correct assessment of the law.

19

grants of summary probation."[17]  The court also cited the fact that in defendant's
1996 conviction of battery (§ 242), the victim was Celia Escobar, the same victim
as in the instant case.  A trial court's reliance on a defendant's prior convictions
and related issues that may be determined by examining the records of prior
convictions (such as the defendant's probationary status and the identity of the
victim in a prior crime of violence) does not violate *Cunningham.*  (*People v. Black*
(2007) 41 Cal.4th 799, 819 (*Black II*), cert. den. *Black v. California* (2008) 128
S.Ct. 1063.)  Further, the existence of one such constitutionally permissible
aggravating factor makes the defendant eligible for the upper term, and any
additional judicial fact-finding in choosing the appropriate sentence dose not
violate the right to a jury trial.  (*Black II, supra,* 41 Cal.4th at p. 813.)  Thus, the
trial court's imposition of the upper terms here did not violate *Cunningham.*

## D. ABUSE OF DISCRETION

Defendant contends that the trial court abused its discretion in imposing the
upper terms for attempted voluntary manslaughter and infliction of great bodily
injury.  According to defendant, his prior convictions were minor and remote in
time, and thus could not form a reasoned basis for selection of the upper term.  Of
course, the trial court has wide discretion in sentencing, and its decision will be
overturned only if it is arbitrary, capricious, or exceeds the bounds of reason.
(*People v. Trausch* (1995) 36 Cal.App.4th 1239, 1247.)  Here the trial court cited
three aggravating factors:  defendant's numerous prior misdemeanor convictions

[17]    Defendant's probation report showed that he had suffered one prior conviction of
reckless driving (Veh. Code, § 23103) in 1990, four prior convictions of driving with a
suspended license (Veh. Code, § 14601.1, subd. (a), one occurring in 1992, two in 1996,
and one in 1998), one prior conviction of petty theft (§ 484, subd. (a)) in 1992, and one
conviction of battery (§ 242) in 1996.

20

(seven in all), the fact that defendant was on summary probation when he committed six of them, and the fact that in his prior battery conviction the victim was Celia Escobar, the same victim as in the instant case. In mitigation, the court found that the jury concluded defendant had committed the instant crime while under provocation. The court concluded that the aggravating factors outweighed the mitigating factors, and imposed the upper terms.

No abuse of discretion appears in the court's reasoning. It is true that defendant's prior convictions were for misdemeanors, that they occurred between 1990 and 1998, and that only one involved violence (the battery conviction in 1996 against Celia Escobar). However, the court could reasonably conclude that the number of defendant's prior convictions, and his probationary status when he committed six of them, suggested that he had little regard for the law and for obeying court orders. Further, his prior conviction of battery against Celia Escobar illustrated that his potential for domestic violence was longstanding, and elevated the seriousness of his attempted voluntary manslaughter against her in the instant case.

Defendant's reliance on *People v. Piceno* (1987) 195 Cal.App.3d 1353 is misplaced. There, the court concluded that the defendant's juvenile record – a "half dozen or so entries" for minor non-violent offenses –could not alone justify imposition of the upper term for vehicular manslaughter without gross negligence committed when the defendant was "two months past his eighteenth birthday." (*Piceno, supra,* 195 Cal.App.3d at p. 1360.) Here, by contrast, defendant's prior convictions occurred as an adult, he violated probation when committing six of them, and he had previously battered the woman whom he victimized in the instant case. There is no comparison to be drawn between the present case and *Piceno*.

21

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, Acting P. J.


We concur:


MANELLA, J.


SUZUKAWA, J.


22

Court of Appeal, Second Appellate District, Div. 4 - No. B185016
**S162239**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

THE PEOPLE, Plaintiff and Respondent,

v.

ANDALIWA ANDRUS, Defendant and Appellant.

The petitions for review are denied.

SUPREME COURT
**FILED**

JUN 1 1 2008

Frederick K. Ohlrich Clerk

_____
Deputy

**GEORGE**
_____
Chief Justice

## PROOF OF SERVICE BY MAIL

### BY PRISONER "IN PRO PER"

I hereby certify that I am over the age of 18 years of age, that I am representing myself, and that I am a prison inmate.

My prison address is:    California State Prison - Solano
Housing: $\partial$ / - $VA$ $M$
P.O. Box 4000
Vacaville, California 95696-4000

On the "*date*" specified below, I served the following document(s) on the parties listed below by delivering them in an envelope to prison authorities for deposit in the United States Mail pursuant to the "Prison Mailbox Rule":

Case Name: _____    Case #: _____

Document(s) Served: _____

_____

_____

The envelope(s), with postage fully pre-paid or with a prison Trust Account Withdrawal Form attached pursuant to prison regulations, was/were addressed as follows:

I declare under penalty of perjury that the foregoing is true and correct. This declaration was executed on    $8 - 8 - 08$    , in Vacaville, California.

                    *"date"*

Signature: _Andaliwa Andrus_

Printed Name: _Andrus, Andaliwa_

Andrus V90136
CSP/SOL 21-V21
P.O. Box 4000
Vacaville, CA 95696-4000

RECEI
AUG 1 4 2

Clerk of the U
District Court fo
District of Califo
450 Golden Gate
Box 36060
San Francisco, CA

Legal Mail

**CSP SOLANO**
**STATE PRISON**

UNITED STATES POSTAGE
PITNEY BOWES
$ 04.80[0]
02 1A
0004632981 AUG 13 2008
MAILED FROM ZIP CODE 95687

...on - Solano

...VED
...008
...KING
...COURT
...CALIFORNIA

...nited States -
...r the Northern -
...rnia
Ave.

94102

PRIORITY MAIL
UNITED STATES POSTAL SERVICE TM
www.usps.gov
LABEL107R, OCT 1997

